**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**December 7, 2012**

**TENAL CIRCUIT**

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

JOEL MONGE,

      Plaintiff - Appellant,

v.

RG PETRO-MACHINERY (GROUP) CO.
LTD.; EAGLE ENERGY SERVICES L.L.C.;
BRONCO ENERGY SERVICES L.L.C.;
EAGLE WELL SERVICE CO. INC. OF
KANSAS; EAGLE WELL SERVICE INC.;
BRONCO DRILLING COMPANY INC.;
BRONCO DRILLING COMPANY L.L.C.,

      Defendants - Appellees,

and

RICHARD ENERGY LLC; RICHARD
MOORE,

      Defendants,

and

LIBERTY INSURANCE CORPORATION,

      Intervenor.

No. 12-6009

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:09-CV-01188-R)**

---

Scott B. Hawkins (John W. Norman and Bradley E. Norman, with him on the briefs), Norman & Edem, P.L.L.C., Oklahoma City, Oklahoma, appearing for Appellant.

C. Todd Ward (C. William Threlkeld, with him on the brief), Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, Oklahoma, appearing for Appellees.

Gary W. Davis, Harvey D. Ellis, Jr., and Adam C. Hall, Crowe & Dunlevy, A Professional Corporation, filed a brief for Appellee RG Petro-Machinery (Group) Co., Ltd.

---

Before **LUCERO, O'BRIEN,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

In 2007, employees of Richard Energy, an Oklahoma company, traveled to China and arranged with RG Petro, a Chinese manufacturer, to purchase rigs that are used to repair oil wells. Richard Energy took possession of the rigs in China and exported them to the United States. The rigs were consigned to Eagle Well Service, Inc. ("EWS"), a Kansas corporation, and delivered in Kansas. EWS later moved one of the rigs to Oklahoma, where Joel Monge, an EWS employee covered by workers' compensation, was seriously injured during an accident involving the rig.

Mr. Monge filed a diversity action against EWS under Oklahoma's intentional tort exception to the exclusive remedy of Oklahoma's Workers' Compensation Act and

against Richard Energy and RG Petro under Oklahoma's manufacturers' products liability laws.  RG Petro filed a motion to dismiss based on lack of personal jurisdiction, and EWS filed a motion for summary judgment contending the intentional tort exception does not apply.  The district court granted both motions.  Mr. Monge filed a motion to alter or amend the court's summary judgment order, which the district court denied except for a request to fix a date in the order.

Mr. Monge appeals, arguing that there is a genuine issue of material fact as to his claim against EWS; that the district court abused its discretion in denying his motion to alter or amend the judgment; and that the district court erred in finding that it lacked personal jurisdiction over RG Petro.  Richard Energy settled with Mr. Monge and is not involved in this appeal.[1]  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

### A. *Factual Background*

RG Petro manufactures workover rigs, which are used to fix oil wells by drawing pipe from the ground.  A traveling block connects sections of pipe to the rig cable as they are pulled from the ground.  As the cable is pulled in, the pipe and the traveling block are pulled toward the crown of the derrick, or the top of the rig's tower.  If the rig's operator

---

[1] Bronco Drilling also was named as a defendant but was dismissed early in the litigation.

pulls too much pipe, or pulls the pipe too quickly, the traveling block can strike the crown and damage the rig in an accident known as a "crown out."

A device known as a "crown saver" is designed to prevent crown outs by stopping the traveling block when the pipe has been pulled too high.  As the pipe rises, the rig's cable winds around a drum.  When too much cable has been pulled, the cable winding around the drum touches the actuating rod of the crown saver, thereby stopping the traveling block.

Rigs are also equipped with a "crown bumper."  A crown bumper is a large block of rubber encapsulating metal rods that in turn are welded to the crown of the rig.  In the event of a crown out, the rubber block absorbs some of the impact of the traveling block.  It therefore serves the purpose of preventing or mitigating damage and injury from a crown out.

Rig 43, the rig on which Mr. Monge was injured, was manufactured in China by RG Petro and exported to the United States by Richard Energy, an Oklahoma company.  It was consigned to EWS, a Kansas company, and shipped by Richard Energy from China to Kansas.  EWS later moved it to the worksite in Oklahoma where Mr. Monge was injured.  Further facts relevant to personal jurisdiction will be discussed later.

On September 29, 2008, Mr. Monge was injured approximately 40 minutes after a crown out.  At the time of the crown out, the rig's supervisor and regular operator, Jesus Vazquez, was in a nearby truck with the seat down and his hat over his head.  Another rig hand, Ipolito Villalobos, was operating the rig.  He testified at his deposition that he had

-4-

been training by doing simple tasks in operating the rig for about six months, and that he did not have very much experience.  Mr. Monge was on the rig floor, and another hand, Phillipe Acevedo, was on the derrick.

Jesse Escobedo was Mr. Vazquez's supervisor and the tool pusher.  He generally oversaw operations and ensured the rig had all the necessary equipment and supplies.  He was not on the site that day.

Mr. Villalobos mistakenly pulled an extra section of pipe, and the traveling block struck the crown bumper.  The actuating rod for the crown saver had been removed, rendering the crown saver inoperable.  After the crown out, Mr. Vazquez approached the rig.  He and the others looked up at the crown and did not see anything wrong, so they resumed pulling pipe.

Mr. Monge's expert reported that the welds attaching the crown bumper to the rig's crown were too small and had not completely fused the steel tubes in the bumper to the backing plate.  The impact of the crown out weakened the already faulty welds.  About 40 minutes after the crown out, the crown bumper detached and fell, striking Mr. Monge and knocking him from the rig.  Mr. Monge was rendered a quadriplegic.  Further facts regarding the incident will be presented below.

### B.  *Procedural Background*

Mr. Monge filed suit in the United States District Court for the Western District of Oklahoma.  Although workers' compensation is normally the exclusive remedy for an employee claim against an employer in worker injury cases in Oklahoma, Mr. Monge

filed suit against EWS under the intentional tort exception to Oklahoma's Workers' Compensation Act.  He alleged that EWS had (1) intentionally bypassed the crown saver and ignored that it was not functional, (2) failed to train its employees on how to use the crown saver, and (3) allowed an inexperienced worker to operate the rig without supervision and without the crown saver.  Mr. Monge also sued RG Petro and Richard Energy under Oklahoma's manufacturers' products liability laws.

RG Petro filed a motion to dismiss for lack of personal jurisdiction.  The district court held an evidentiary hearing on that issue and ordered the parties to file supplemental briefs.  It concluded that Mr. Monge had failed to prove by a preponderance of the evidence that the court could exercise either specific or general personal jurisdiction over RG Petro.

EWS filed a motion for summary judgment.  The district court concluded that Mr. Monge had not proven that there was a genuine issue of fact as to an element of his prima facie case—that EWS knew that an injury such as Mr. Monge's was substantially certain to result from EWS's conduct.  The court therefore granted summary judgment in favor of EWS.

Mr. Monge then filed a motion to alter or amend the judgment under Rule 59 of the Federal Rules of Civil Procedure on the basis of previously unavailable evidence. The district court denied the motion on two grounds:  (1) the evidence had previously been available and Mr. Monge's counsel had not established that he had made diligent

efforts to discover the evidence; and (2) the evidence would not have affected the court's summary judgment decision in favor of EWS.

## II. DISCUSSION

Mr. Monge argues that the district court (1) improperly interpreted and applied the intentional conduct exception to the Workers' Compensation Act known as the "substantial certainty test;" (2) abused its discretion in denying Mr. Monge's motion to alter or amend the judgment; and (3) erred in finding that it lacked personal jurisdiction over RG Petro.  We will analyze these arguments in turn.

### A.  *The Intentional Conduct Exception and Summary Judgment*

Mr. Monge argues that the district court erred in granting summary judgment for EWS because the court improperly interpreted and applied the intentional conduct exception to the Workers' Compensation Act.

We review de novo a district court's decision to grant summary judgment, applying the same standards the district court should apply.  *E.E.O.C. v. C.R. England*, 644 F.3d 1028, 1037 (10th Cir. 2011).  A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[W]e construe all facts and reasonable inferences in a light most favorable to the nonmoving party."  *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1078 (10th Cir. 2006) (citation omitted) (quotations omitted).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way."  *Crowe v. ADT Sec. Servs., Inc.*,

649 F.3d 1189, 1194 (10th Cir. 2011) (quotations omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Id*. (quotations omitted).

We examine the legal background on the substantial certainty test, additional factual background, and how the law applies to this case. We finally consider additional arguments made by Mr. Monge.

### 1. *The Substantial Certainty Test*

Under Oklahoma's Workers' Compensation Act, workers' compensation is normally the exclusive remedy for an employee to recover from the employer for job-related injuries. But Oklahoma law has recognized an exception when an employee "has been wilfully injured by his employer." *Parret v. UNICCO Serv. Co.*, 127 P.3d 572, 574 (Okla. 2005) (quotations omitted). In *Parret*, the Oklahoma Supreme Court adopted the substantial certainty test to determine whether an injury resulted from intentional conduct. *Id*. at 575.[2]

---

[2] The Oklahoma legislature amended in 2010 and repealed in 2011 the statute containing the intentional tort exception, enacting in its place Okla. Stat. tit. 85, § 302. *See Jordan v. W. Farmers Elec. Co-op.*, 2012 OK 94, ¶ 6 n.2, ___ P.3d ___ (Okla. Nov. 13, 2012); *id.* at ¶ 4 n.6 (Kauger, J., concurring). The legislature thereby eliminated the substantial certainty test as part of the intentional tort exception. It declared that an intentional tort exists only when the employer acted with "willful, deliberate, specific intent" to cause injury. Okla. Stat. tit. 85, § 302(B). The Oklahoma Supreme Court recently held that the revised statute does not have retroactive application. Rather, "liability for on the job injuries is governed by the law in effect at the time of the injury." *Jordan*, 2012 OK 94, ¶ 6 n.2.

To recover from an employer beyond a workers' compensation remedy, an "employer must have (1) desired to bring about the worker's injury or (2) acted with the knowledge that such injury was substantially certain to result from the employer's conduct." *Id*. at 579. "Under the second part of this standard," the substantial certainty test, "the employer must have intended the act that caused the injury with knowledge that the injury was substantially certain to follow." *Id*. "[M]ore than knowledge and appreciation of the risk is necessary." *Id*. (quotations omitted). Even recklessness or wantonness is not enough. *Id*. There must be more than knowledge of "foreseeable risk," "high probability," or "substantial likelihood"; there must be "knowledge of the 'substantial certainty' of injury." *Id*.

In *Price v. Howard*, 236 P.3d 82 (Okla. 2010), the Oklahoma Supreme Court further explained that "[e]stablishing that an employer has acted in a manner resulting in an employee's injuries being substantially certain presents a formidable barrier to recovery in tort." *Id*. at 90. This is because "**nothing short of a demonstration of the employer's knowledge of the substantial certainty of injury will suffice.** The employer's cognizance of a foreseeable risk, high probability, or substantial likelihood of injury are insufficient to impose tort liability." *Id*. at 88 (bold in original).

Most recently, while reviewing a trial court's dismissal of a *Parret* complaint for failure to state a claim, the Oklahoma Supreme Court stated that "[s]ubstantial certainty . . . is found when an employer intended the act that caused the injury with knowledge that the injury was substantially certain to follow." *Jordan v. W. Farmers Elec. Co-op.*,

2012 OK 94, ¶ 9, ___ P.3d ___ (Okla. Nov. 13, 2012). Such "knowledge may be inferred from the employer's conduct and all the surrounding circumstances." *Id*. (quotations omitted).

### 2. *Additional Background*

The evidence presented by the parties included affidavit and deposition testimony from Rig 43 workers, a safety alert, and expert reports.

### a. *Affidavit of Jesus Vazquez*

In an affidavit, the rig's supervisor and regular operator, Jesus Vazquez, stated that "[EWS] should have known through their inspections that the [actuating rod] was not placed correctly and was not being used for its purpose—to prevent the traveling blocks from striking the top of the rig." ROA, Vol. III at 91. He also stated that, "[w]ithout the [actuating rod] in use, it is easy to see how this accident was certain to happen." *Id*.

### b. *Deposition of Ipolito Villalobos*

Mr. Villalobos, who was operating Rig 43 the day Mr. Monge was injured, stated at his deposition that EWS should have fixed the crown saver because, in his opinion, the crown out would never have happened otherwise. After the accident, he left EWS in part for better pay and in part because he felt better about safety at a different company. He also testified that he had not received any training about crowning out before the accident. *Id*. at 69. Rather, Mr. Vazquez had just told him to "make sure [to] count the tubing [(sections of pipe)] and [not] go up too high." *Id*.

Mr. Villalobos further testified that he had never before been on a rig during a crown out and that, at the time of Mr. Monge's injury, he felt he was being safe and that his coworkers would have let him know if he was not.  "[C]rowning out really wasn't a big issue for me, a big problem, because you have [the crown bumper]," such that if "you miss count [and] crown out . . . no damage is really done to the actual frame."  *Id*. at 81.

### c. *Deposition Testimony of Jesse Escobedo*

Mr. Escobedo, the tool pusher for the rig, testified at his deposition that he had seen pipe pulled past the safety stopping point at least 10 times during his career, but he had never seen the pipes taken past that point on Rig 43.  He stated that he had never tested the crown saver to determine if it was functioning because "[n]obody ever hit the crown . . . when [he] was there."  *Id*. at 139.  He testified that he was assigned to Rig 43 when it was brand new and that, at the time, he did not know about crown savers, had never used one, and was not trained on how to use one.

Mr. Escobedo also stated that Mr. Monge would not have been hurt if the crown saver had been activated.  *Id*. at 140.  He confirmed that when EWS's safety inspector checked the rig, he always checked the crown saver as "all right."  *Id*. at 140.

### d. *Minerals Management Service Safety Alert*

The record contains a safety alert from the Minerals Management Service of the U.S. Department of Interior.  It informed rig owners that a crown out can occur even if a crown saver is activated when pipe is being pulled at high speed and with high momentum.

-11-

### e. *Experts' Reports*

Charles Powell, Mr. Monge's expert, stated in his report that the crown saver "was reportedly not used nor maintained" on the rig, and that the "activation rod that senses an imminent crown out was totally missing from" the crown saver.  ROA, Vol. III at 111.

Terry Brittenham, Richard Energy's expert, stated in his report that the "crown bumper is intended to prevent most of the rig damage that may result from low speed and low load" collisions, but that it "is not designed nor intended to prevent collisions or to prevent all collision-related damage or consequences." *Id*. at 94.  His report also stated that the rig crew was working short-handed, with only Mr. Monge on the floor and the other floor hand running the rig.

Robert Jay Block, EWS's expert, said in his report that "falling objects from that great height are substantially certain to cause injury if a worker is struck."  ROA, Vol. III at 167.  Nevertheless, he added that the purpose of the crown bumper is to absorb the shock of a crown out and that "[i]t had not been the experience of" EWS that crown outs on such rigs "caused the crown bumpers to come apart and parts to fall." *Id*.

### 3. *EWS and the Substantial Certainty Test*

At issue is whether EWS "acted with the knowledge that such injury was substantially certain to result from the employer's conduct." *Parret*, 127 P.3d at 579. Under the substantial certainty test, an "employer must have knowledge of more than 'foreseeable risk,' more than 'high probability,' and more than 'substantial likelihood.'" *Id*.  Rather, "knowledge of the 'substantial certainty' of injury" is required. *Id*.  Although

-12-

EWS's actions were arguably negligent, and perhaps even reckless, the record lacks evidence that EWS "acted with the knowledge that such injury was substantially certain to result from [its] conduct."  *Id.*

Viewing the evidence, including the circumstances surrounding the accident, in the light most favorable to Mr. Monge, the record shows that a crown saver may prevent damage due to crown outs, that Rig 43 was equipped with a non-working crown saver, and that EWS's safety inspectors had falsely certified that the crown saver was "all right."  The record also shows that an inexperienced hand was operating the rig; that the rig was short-handed, resulting in fewer people to notice that too much pipe was being lifted; and that the supervisor, who was the regular operator of the rig, was not monitoring the inexperienced operator.[3]

From the evidence, a rational trier of fact could find knowledge of foreseeable risk or even knowledge of substantial likelihood of injury.  But a rational factfinder could not find knowledge of the substantial certainty of injury.  Two case examples reinforce this conclusion.

In *Torres v. Cintas Corp.,* 672 F. Supp. 2d 1197 (N.D. Okla. 2009), Mr. Torres was working for Cintas, a uniform supply company, when he climbed onto the moving conveyor belt of an automated wash alley and fell into a dryer while trying to clear a

---

[3] Mr. Escobedo's deposition testimony that he had seen pipe pulled past the safety stopping point at least 10 times during his career does not support an inference that EWS had previously experienced any crown outs or injuries from crown outs.

dryer jam.  He died as a result.  His surviving spouse sued Cintas and alleged a *Parret* claim for intentional tort.  The court denied Cintas's motion for summary judgment because there was an issue of fact whether Cintas was aware of substantial certainty of injury.  The denial was based on evidence that Cintas management knew its employees had previously suffered injury by climbing onto the energized conveyor belt and conflicting evidence that management was aware that numerous employees violated safety procedure by continuing to climb onto moving conveyor belts to clear jams.  *Id.* at 1207-11.  In contrast to Cintas, EWS was not aware of previous crown outs on its rigs because there was no evidence of previous crown outs occurring.  EWS therefore could not have knowledge of substantial certainty of injury suffered by Mr. Monge.

In *Price*, plaintiff was the widow of an airplane passenger who died in a crash of his employer's airplane. 236 P.3d at 85-86.  She sued the employer, ServiCenter, Inc., for wrongful death.  ServiCenter moved for summary judgment, claiming protection under the exclusivity provision of Oklahoma's Worker's Compensation Act.  The Oklahoma Supreme Court accepted that "ServiCenter was aware that the airplane was carrying passengers in violation of its temporary flight restrictions, that it was overweight, and that it took off in foul weather."  236 P.3d at 85.  But even though these circumstances "substantially increased the likelihood that complications could occur," *id.* at 89, and even if "the employer's conduct in allowing the plane to take flight may have been reckless," *id.* at 90, Mrs. Price could not overcome the "formidable barrier" of

showing that ServiCenter "acted with the knowledge that such injury was substantially certain to result from the employer's conduct." *Id.*

EWS was aware that the crown saver on its rig was not operational, but even if this deficiency "substantially increased the likelihood that complications could occur," and even if EWS's overall conduct was reckless, Mr. Monge was unable to show that EWS "acted with the knowledge that such injury was substantially certain to result." *Id.* As the court in *Parret* stressed in defining the substantial certainty test, "The issue is not merely whether injury was substantially certain to occur, but whether the employer knew it was substantially certain to occur." 127 P.3d at 579. Mr. Monge not only failed to show that his injury was substantially certain to occur, he also could not demonstrate EWS's "subjective appreciation of the substantial certainty of injury." *Id.*

Mr. Monge may have had a meritorious claim to recover for his tragic injuries outside of workers' compensation if he were required to show that EWS had knowledge of foreseeable risk, high probability, or even substantial likelihood of injury, but "[n]othing short" of EWS's knowledge of the substantial certainty of injury will do under *Parret* and *Price*. *Parret*, 127 P.3d at 579.[4]

Finally, as the Oklahoma Supreme Court said in *Price*, "violation of government safety regulations, even if wilful and knowing, does not rise to the level of an intentional

_____

[4] The Oklahoma Supreme Court's recent decision in *Jordan*, which reversed the dismissal of a *Parret* complaint because it contained sufficient allegations, does not change our analysis or conclusions here.

-15-

tort." *Price*, 236 P.3d at 90.  Even if EWS violated the industry standard promulgated by the American Petroleum Institute ("API") about the use of the crown saver, this would not "rise to the level of an intentional tort." *Id*.

### 4.  *Mr. Monge's Additional Arguments*

Mr. Monge presented two additional arguments:  (1) the district court invaded the province of the jury in deciding the cause of the injury; and (2) the district court incorrectly required him to show that EWS anticipated the specific mode and manner of his injuries.

### a.  *Causation and the Jury's Role*

Mr. Monge argues that the district court erred when it stated, "The mere failure to use the Crown Saver, however, was not the cause of the accident.  The analysis is not as simple as Plaintiff would like."  ROA, Vol. IV at 137-38.  Mr. Monge contends this statement demonstrates that the district court determined the cause of the accident, thus invading the province of the jury.  He argues that whether Mr. Monge's injuries were caused by the crown bumper's breaking and falling or by the failure to use the crown saver is a question that a jury could have resolved either way, and summary judgment was therefore inappropriate.

The court's statement must be understood in context.  This statement is not from the district court's summary judgment order, but from its order denying Mr. Monge's later Rule 59(e) motion to alter or amend the district court's judgment.  It traces back to the court's conclusion in the summary judgment order that the API industry standard on

-16-

the use of crown savers could not give rise to an intentional tort claim.  In his motion to alter or amend, Mr. Monge argued that the court misunderstood his position:  he was not arguing that the API standard alone gave rise to an intentional tort claim, but that it should be considered with the surrounding circumstances.  In its order denying the motion to alter or amend, the district court stated,

> Plaintiff contends that the act that caused the injury was the intentional bypassing of the Crown Saver safety device.  Plaintiff contends the Court misunderstood its position, that if the Crown Saver was not used injury was substantially certain to occur.  The mere failure to use the Crown Saver, however, was not the cause of the accident.  The analysis is not as simple as Plaintiff would like, and following Plaintiff's theory would result in liability in every case in which a safety rule or regulation was not followed and an employee suffered an injury.  This, however, was not the court's holding in *Parret*.  See *Price*, 236 P.3d at 90 ("[V]iolation of government safety regulations, even if wilful and knowing, does not rise to the level of an intentional tort.").

*Id.*  With the benefit of the foregoing, it should be clear that Mr. Monge's argument suffers from two defects.

First, Mr. Monge took the district court's statement out of context.  The statement came from the court's order denying the motion to alter or amend, not its order granting summary judgment in EWS's favor.  Mr. Monge fails to point this out and to explain why the court's reasoning in the later order indicated any error in its earlier order.

Second, understood in proper context, the court was addressing the effect of an industry-recommended safety practice on *Parret*'s subjective knowledge requirement, not

-17-

the cause of the accident.  The district court stated, "[F]ollowing Plaintiff's theory would result in liability in every case in which a safety rule or regulation was not followed and an employee suffered an injury." *Id.* at 138.  The court referred to *Parret* and its progeny for the proposition that more was required to establish knowledge of substantial certainty than the failure to follow a safety regulation.  Because Mr. Monge sued EWS under an intentional tort theory with a subjective knowledge requirement, he had to show more than the violation of a safety regulation.  Mr. Monge confuses causation with knowledge. The district court correctly required that he prove that EWS acted with the knowledge that an injury such as Mr. Monge's was substantially certain to result from its conduct. *Parret*, 127 P.3d at 579.

### b.   *Evidence of the Specific Mode and Manner of Injuries and of Prior Crown Outs*

Mr. Monge argues that the district court failed to consider all the surrounding circumstances of the accident and that it unduly focused on whether EWS anticipated the specific mode and manner of his injuries—a bumper block falling after a crown out.  He also contends that the district court relied too much on whether there was evidence that EWS had experienced previous crown outs.  Mr. Monge is wrong on both counts.

First, the district court did not focus solely on the falling bumper block in applying the substantial certainty test.  It said:  "The record in this case is devoid of any evidence that anyone on Defendant's behalf appreciated the risk of not using the Crown Saver on the rig *or* of the bumper block falling following a crown out."  ROA, Vol. IV at 51

-18-

(emphasis added).  Moreover, the district court understandably and correctly considered

EWS's knowledge of the substantial certainty of a falling bumper block injury because

that is how the accident occurred.  Finally, Mr. Monge could not show in opposition to

summary judgment that EWS had "knowledge that such injury was substantially certain

to result," whether through a falling bumper block or some other mode and manner, and

such a showing is what *Parret* requires.  126 P.3d at 579.

Second, the district court mentioned the lack of evidence of previous crown outs at

EWS as a consideration in finding that EWS was not liable under the substantial certainty

test, but the court did not say that the absence of such evidence alone would preclude Mr.

Monge from meeting the test.  In fact, the court said:  "Nothing in the Court's Order was

intended to indicate that a prior identical incident is required to establish substantial

certainty, although a similar prior act clearly will provide substantial proof of such."

ROA, Vol. IV at 139.

Finally, Mr. Monge argues that the district court failed to consider the

circumstances surrounding the accident and EWS's behavior.  Our review of the district

court's decision fails to support this contention.

\* \* \*

Based on the foregoing, we affirm the district court's grant of summary judgment.

### B.  *Mr. Monge's Motion to Alter or Amend the Judgment*

We next address whether the district court erred in denying Mr. Monge's motion

under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend the judgment.

The district court denied the motion because it was not based on newly discovered evidence.

We review the denial of a Rule 59(e) motion to alter or amend a judgment for abuse of discretion.  *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1178 (10th Cir. 2011).  "A district court abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *Id.* (citation omitted) (quotations omitted).

### 1. *Background on Mr. Monge's Rule 59(e) Motion*

On June 18, 2010, Mr. Monge filed a notice and subpoena to depose Kevin Ediger, EWS's safety director, on July 21, 2010.  Because this subpoena was filed with the subpoenas of employees of a company that was later dismissed as a defendant, this deposition never occurred.

On July 14, 2011, Mr. Monge contacted EWS to arrange Mr. Ediger's deposition. EWS filed its motion for summary judgment on August 1, 2011, the deadline for dispositive motions.  Mr. Monge filed his response to the motion on August 22, 2011. Mr. Ediger was deposed on September 15, 2011.  The district court granted summary judgment on October 5, 2011.  Mr. Monge filed his Rule 59(e) motion to alter or amend the judgment on October 26, 2011.  He justified the motion to alter or amend on the basis of newly discovered evidence:  the September 15 deposition of Kevin Ediger.

In his motion to alter or amend, Mr. Monge argued Mr. Ediger's testimony was newly discovered evidence that created genuine issues of material fact as to whether

EWS acted with knowledge that Mr. Monge's injuries were substantially certain to result. The district court denied the motion, concluding that the evidence was not newly discovered. The district court also concluded that Mr. Ediger's testimony would not have changed its decision in favor of EWS.

### 2. *Rule 59(e) Legal Background*

"The purpose [of a Rule 59(e)] motion is to correct manifest errors of law or to present newly discovered evidence." *Webber v. Mefford*, 43 F.3d 1340, 1345 (10th Cir. 1994) (citation omitted) (quotations omitted). "Grounds for granting a Rule 59(e) motion include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Somerlott v. Cherokee Nation Distributors, Inc.*, 686 F.3d 1144, 1153 (10th Cir. 2012) (quotations omitted).

To support a Rule 59(e) motion with additional evidence, such as the deposition testimony of EWS's safety director, the moving party must show "(1) that the evidence is newly discovered, or (2) if the evidence was available at the time summary judgment was granted, that counsel made a diligent yet unsuccessful attempt to discover the evidence." *Webber*, 43 F.3d at 1345.

### 3. *The District Court's Order*

The district court found that Mr. Ediger's testimony was available to Mr. Monge before the court entered its summary judgment order. At the time Mr. Monge responded to the summary judgment motion, he knew that he wanted to depose Mr. Ediger, but he

neither requested additional time for discovery nor filed a Rule 56(d) motion indicating that additional time was needed to respond to EWS's summary judgment motion.

The court also found that Mr. Monge failed to establish that he made diligent efforts to discover the evidence.  Mr. Monge knew Mr. Ediger's name and position with EWS well before his counsel began attempting to schedule a deposition in 2011. Moreover, the district court noted that Mr. Monge did not seek leave to supplement his response to the summary judgment motion once the deposition was taken, although the court had not yet issued its order.

### 4. *Mr. Monge's Arguments*

Mr. Monge argues that Mr. Ediger's testimony was newly discovered evidence. Under Rule 30(e) of the Federal Rules of Civil Procedure, a "deponent must be allowed 30 days after being notified . . . that the transcript or recording is available . . . to review the transcript or recording" and "to sign a statement listing" any changes that need to be made.  Mr. Monge argues that, because of the time it took Mr. Ediger to sign his statement, the deposition was not final until 20 days after the court filed its summary judgment order.

Mr. Monge also argues that the district court was incorrect in finding that his earlier knowledge of Mr. Ediger's identity demonstrated a lack of diligence.  Mr. Monge initially issued a subpoena to depose Mr. Ediger on July 21, 2010.  Mr. Monge states he believed at that time that Bronco Drilling employed Mr. Ediger, and he argues that the

subpoena to depose Mr. Ediger in July 2010 became a nullity when Bronco Drilling was dismissed as a party.

Mr. Monge alternatively argues that he made a diligent but untimely attempt to depose Mr. Ediger by informally requesting dates to depose him almost a month before EWS filed its motion for summary judgment.  He argues that his requests via email rather than subpoena should not be used against him.

## 5. *Analysis*

Mr. Monge has not demonstrated that there was new evidence previously unavailable as the ground for his Rule 59(e) motion.  Bronco Drilling was dismissed as a defendant on July 23, 2010.  On November 30, 2010, in his Rule 26 initial disclosures, Mr. Monge listed Mr. Ediger as a potential witness having information about EWS's policies and procedures and about the training of EWS employees.  Mr. Monge gave the same address and phone number for Mr. Ediger as for other EWS employees on the list: the address and phone number of EWS's counsel.  The identity and the testimony of Mr. Ediger were therefore available to Mr. Monge well before the summary judgment order was entered on October 5, 2011.

Even if the evidence had not been available until Mr. Ediger was deposed on September 15, 2011, Mr. Monge could have requested under Rule 56(d) that the court defer consideration of the summary judgment motion.

Mr. Monge also has not demonstrated that he made a diligent attempt to obtain the evidence.  He waited until July 14, 2011, to begin arranging the deposition of Mr.

-23-

Ediger.  The district court had set the deadline for dispositive motions for August 1, 2011, and had instructed the parties to conduct any discovery necessary for such motions before that date.

Mr. Monge has not shown that the district court committed a "clear error of judgment" in finding that there was no newly discovered evidence.  *ClearOne Commc'ns, Inc.*, 653 F.3d at 1178.  The district court did not abuse its discretion in denying the motion to alter or amend the judgment.[5]

### C.  *Personal Jurisdiction over RG Petro*

We turn to whether the district court erred in concluding that it lacked specific and general jurisdiction over RG Petro.  Because the district court conducted an evidentiary hearing, Mr. Monge was required to show personal jurisdiction by a preponderance of the evidence.  *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 n.4 (10th Cir. 2008).  We review the court's legal determination de novo and its factual findings for clear error.  *Id.* at 1070; Fed. R. Civ. P. 52(a)(6); *see also Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995); *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 326 (6th Cir. 1990).

---

[5] The district court also concluded that, if it were to consider the merits of Mr. Ediger's testimony, such evidence would not have affected its decision.  Mr. Monge argues that Mr. Ediger's testimony combined with the rest of the evidence meets *Parret*'s subjective knowledge requirement.  Because the district court did not abuse its discretion in finding that Mr. Ediger's testimony was not newly discovered evidence, we do not address this argument.

### 1. *Legal Background*

Personal jurisdiction in this case is based on the laws of the forum state and whether jurisdiction comports with constitutional due process. *Intercon, Inc. v. Bell Atl. Internet Solutions, Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000). Oklahoma courts "may exercise jurisdiction on any basis consistent with the Constitution of this state and the Constitution of the United States." Okla. Stat. tit. 12, § 2004(F). As "Oklahoma's long-arm statute permits the exercise of any jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry." *Intercon*, 205 F.3d at 1247.

Personal jurisdiction over a nonresident defendant satisfies due process if there are sufficient "minimum contacts between the defendant and the forum state." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980); *Intercon*, 205 F.3d at 1247. The minimum contacts may support specific jurisdiction or general jurisdiction. *Id*.

### a. *Specific Jurisdiction*

Specific jurisdiction calls for a two-step inquiry. *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). First, has the plaintiff shown that the defendant has sufficient minimum contacts with the forum state? *Id*. at 1075-76. Second, would personal jurisdiction over the defendant offend "traditional notions of fair play and substantial justice"? *Id*. at 1075; *see Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987).

-25-

To satisfy the minimum contacts requirement for specific jurisdiction, "we examine whether the defendant 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'"  *Id.* at 1076 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  The "requirement of 'purposeful availment' for purposes of specific jurisdiction precludes personal jurisdiction as the result of 'random, fortuitous, or attenuated contacts.'"  *Bell Helicopter Textron, Inc. v. HeliQwest Int'l, Ltd.*, 385 F.3d 1291, 1296 (10th Cir. 2004) (quoting *Burger King*, *Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).  Although "it is foreseeable that" a product might travel to a forum state, such foreseeability is not "a sufficient benchmark for personal jurisdiction under the Due Process Clause."  *World-Wide Volkswagen*, 444 U.S. at 295.  "[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  *Id.* at 297.

In addition to the requirement that a defendant "purposefully direct[] his activities at residents of the forum," the litigation must "result[] from alleged injuries that arise out of or relate to those activities."  *Intercon*, 205 F.3d at 1247 (quoting *Burger King*, 471 U.S. at 472); *see also Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996) (defendant's contacts "must reflect purposeful availment *and* the cause of action must arise out of those contacts."); *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1092 (10th Cir. 1998) (defendant's actions must "create a

-26-

substantial connection with the forum state," and the "defendant's presence in the forum [cannot have arisen] from the unilateral acts of someone other than the defendant." (citations omitted) (quotations omitted)).

Thus, a court must "determine whether a nexus exists between the Defendant['s] forum-related contacts and the Plaintiff's cause of action." *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160 (10th Cir. 2010) (quotations omitted). Whether a defendant has the requisite minimum contacts with the forum state "must be decided on the particular facts of each case." *Benton*, 375 F.3d at 1076 (quotations omitted). The court must examine the quantity and quality of the contacts. *OMI*, 149 F.3d at 1092.

In *World-Wide Volkswagen*, owners of a new Audi purchased in New York decided to drive to their new home in Arizona. 444 U.S. at 288. While driving through Oklahoma, they experienced a fiery accident that severely burned several of the passengers in the Audi. The passengers sued the automobile retailer and its wholesaler, New York corporations, in Oklahoma. The Supreme Court held there was no jurisdiction in Oklahoma over the defendants because their product's presence in the forum arose from the unilateral acts of the Audi owners. *Id*. at 295; *see also OMI*, 149 F.3d at 1092.

**b.  *General Jurisdiction***

General jurisdiction requires that a defendant have contacts with the forum "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *see also Trujillo v. Williams*, 465 F.3d 1210, 1218 n.7 (10th Cir. 2006) (general jurisdiction

-27-

requires "'continuous and systematic' general business contacts with the forum state"

(quoting *Helicopteros Nacionales v. Hall,* 466 U.S. 408, 415 (1984))); *Shrader v.*

*Biddinger*, 633 F.3d 1235, 1243 (10th Cir. 2011) ("commercial contacts here must be of a

sort that approximate physical presence in the state" (quotations omitted)). "Because

general jurisdiction is not related to the events giving rise to the suit, courts impose a

more stringent minimum contacts test, requiring the plaintiff to demonstrate the

defendant's continuous and systematic general business contacts." *Benton*, 375 F.3d at

1080 (quotations omitted).

For example, in *Helicopteros*, a Colombian company had spent more than $4

million to purchase 80 percent of its helicopters, spare parts, and accessories from Texas

sources from 1970-77. 466 U.S. at 411, 418. The company had sent its pilots,

management, and maintenance personnel to be trained in Texas during the same period.

*Id*. The Supreme Court concluded that the Texas courts lacked general jurisdiction over

the company despite these numerous contacts with Texas. *Id*. In *Benton*, we concluded

that "two dozen transactions taking place over a period of eight years . . . is not sufficient

to meet the high burden of demonstrating . . . 'continuous and systematic general

business contacts.'" 375 F.3d at 1080. And in *Shrader*, we said that "engaging in

commerce with residents of the forum state is not in and of itself the kind of activity that

approximates physical presence within the state's borders." 633 F.3d at 1243 (quotations

omitted).

-28-

## 2. *Additional Factual Background*

RG Petro is a Chinese corporation with its headquarters and principal place of business in Nanyang City, Hanan Province, People's Republic of China.  It builds workover rigs.  In October 2005, Warren Wang, an employee of Richard Energy, an Oklahoma corporation, visited RG Petro in China.  On October 29, 2005, the two companies entered into a sales contract for Rig 43 and three other workover rigs.  RG Petro built the rigs in four or five months.  They were delivered to Richard Energy at the Shanghai seaport in April 2006.

The Certificate of Origin produced by RG Petro for Rig 43 indicated that RG Petro built the rig, Richard Energy exported it to the United States, and it was consigned to EWS.  The shipping mark on the certificate states, "Richard Energy, in Waynoka, Ok."  In his deposition, an RG Petro representative testified that Richard Energy had informed RG Petro that all four of the rigs were going to EWS in Liberal, Kansas.  Richard Moore of Richard Energy testified that the rig was transported from Shanghai to the Port of Houston.  He also testified that, because the certificate stated that the rig was being consigned to EWS in Liberal, Kansas, RG Petro would not have believed from the shipping mark that the rig was going to Oklahoma.[6]  When parts were broken during

---

[6] Mr. Moore was asked, "So if RG Petro originates this document and they have it coming to—shipping mark as Richard Energy in Waynoka, Oklahoma, wouldn't Richard Energy or RG Petro believe or have knowledge that the rig is coming to the State of Oklahoma?"  RG Supp. App. at 15.  Mr. Moore responded, "No, they would not because they're consigning it to Liberal, Kansas."  *Id*. at 16.

shipping, Richard Energy contacted RG Petro, which sent replacement parts to EWS in

Liberal, Kansas.

The record contains eight emails between RG Petro and Richard Energy, from

February 7, 2006, until April 6, 2006.

- February 7, 2006, from "Andy" Song Gang, RG Petro's international sales department manager, to Richard Energy.  Mr. Song responded to a request, saying that RG Petro would send some pictures and technical specifications for a brochure Richard Energy was creating.  He also notified Richard Energy that a product requested by a customer in Libya was ready.
- February 14, 2006, from Mr. Song to Richard Moore at Richard Energy. The email transmitted a contract for five additional rigs.  It also provided requested advice about whether those rigs needed an extra water tank.  In a later deposition, Mr. Song testified that the contract for those rigs was never completed.
- February 15, 2006, from Mr. Song to Mr. Moore.  The email was a response to further questions from EWS about the water brakes.  Richard Energy had forwarded an email from EWS about the water brakes, to which RG Petro was responding.  The response also indicated to Richard Energy that RG Petro would fax back the contract for five rigs as soon as it was received.
- February 20, 2006, from Mr. Song to Mr. Moore.  Mr. Song said that he would send a set of rig specifications and asked if Richard Energy would like to order a year of spare parts.  In his later deposition, Mr. Song explained that when Mr. Wang visited China to buy the rigs, Mr. Wang considered buying spare parts that RG Petro usually sells with the rigs, but he did not decide at that time whether to buy the spare parts.  The February 20 email from RG Petro was following up to see if the spare parts were wanted.
- February 22, 2006, from Mr. Song to Mr. Moore.  The emails exchanged that day resolved some confusion about the brand name of the water brakes.
- March 3, 2006, from Mr. Song to Mr. Moore.  Mr. Song stated that RG Petro would try to obtain an import license for an engine and transmission and asked about an advance payment for the five additional rigs.
- March 11, 2006, from Mr. Song to Mr. Moore.  Mr. Song wrote that he had given a catalog to Richard Energy's representative and asked for specifications necessary to import a transmission.  In his deposition, Mr. Song testified that the catalog was an American transmission catalog.

-30-

- April 6, 2006, from Mr. Song to Mr. Moore.  Mr. Song thanked Mr. Moore for a packing list and invoice and asked Mr. Moore to look at an attached quotation for an xj550 rig.  Mr. Song also advised Mr. Moore of the status of the shipment containing Rig 43: two of the xj350 rigs had arrived at the seaport and two more would be arriving that weekend.

In September 2006, RG Petro received an email from two prospective clients in Oklahoma.  Three RG Petro representatives were then in Houston.  They flew to Oklahoma City to meet with the prospective clients and returned to Houston that same day.

Finally, RG Petro maintained an English-language website, where it provided information about its products, technology, and markets, as well as contact information and links to Chinese- and Russian-language versions of the website.  The website advertised RG Petro as offering "good-quality products and the best services with the purpose to meet the demands of the petroleum industry both at home and abroad."  ROA, Vol. I at 76.

### 3. *District Court Decision*

After conducting an evidentiary hearing, the district court concluded that RG Petro's contacts with Oklahoma regarding Rig 43 were insufficient to support specific jurisdiction.  It found that Rig 43, from the outset, was to be consigned to EWS and sent to Liberal, Kansas, and it found that EWS, not RG Petro or Richard Energy, later brought the rig into Oklahoma.  The court also found that RG Petro did not solicit the sale of Rig 43 in Oklahoma.  Richard Energy approached RG Petro in China to purchase the rig.  The court found that the emails exchanged between RG Petro and Richard Energy occurred

-31-

after completion of the contract for Rig 43, and that they did not relate to the incidents giving rise to this litigation.  Finally, the court found that replacement parts for parts broken during shipping were sent to Kansas and not to Oklahoma.

The district court also concluded that the rig purchases, emails, and one-day visit by RG representatives to Oklahoma did not establish the continuous and systematic contacts necessary for general personal jurisdiction.

### 4.  *Mr. Monge's Arguments*

Mr. Monge argues that specific jurisdiction is proper because RG Petro could reasonably anticipate being haled into an Oklahoma court after conducting and soliciting business there.  RG Petro knew that Richard Energy was an Oklahoma company, and the sales documents identified Richard Energy's Oklahoma address.

Mr. Monge also argues that the emails were related to the incidents giving rise to the litigation because the contract for Rig 43 was not performed until after all the emails had been exchanged.  He further argues that replacement water brakes for parts that were broken on unspecified rigs during shipment must have been sent to Oklahoma because the contract for Rig 43 and its Certificate of Origin bore an Oklahoma address.  He finally argues that it was reasonably foreseeable to RG Petro that its products would end up in Oklahoma and thus that it could be haled into court there.[7]

---

[7] Mr. Monge also addressed the second step of specific jurisdiction analysis—whether exercising personal jurisdiction would offend traditional notions of fair play and
Continued . . .

Regarding general jurisdiction, Mr. Monge argues that (1) the sale of four, and possibly 12, rigs to Richard Energy; (2) RG Petro's phone and fax listings that, while not Oklahoma numbers, are accessible in Oklahoma; (3) a website with those phone numbers; (4) emails soliciting business from an Oklahoma company; (5) the company representatives' visit to Oklahoma; and (6) revenue from an Oklahoma customer, altogether establish continuous and systematic contacts with the forum.

### 5.  *RG Petro's Arguments*

On specific jurisdiction, RG Petro quotes *TH Agriculture & Nutrition, LLC v. Ace European Group Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007):  a "contract with an out-of-state party cannot, standing alone, establish sufficient minimum contacts with the forum state."

RG Petro also argues that Rig 43 was delivered to Richard Energy in China, imported to the United States by Richard Energy, and destined for Liberal, Kansas—not Oklahoma.  RG Petro was never told the rig would later be moved into Oklahoma by its Kansas owner.

RG Petro also argues that neither the replacement parts nor the emails relate to the claim that Mr. Monge was injured by a defective weld on Rig 43.

_____

Cont.

substantial justice.  We need not reach this argument, as we hold that Mr. Monge has not established that RG Petro had sufficient minimum contacts with the forum.

Regarding general jurisdiction, RG Petro argues that Mr. Monge has not demonstrated clear error as to the district court's findings of fact.  It argues that general jurisdiction requires regularly conducted business activity within the state, not isolated transactions with a single Oklahoma resident.  It also argues that (1) its phone numbers are not Oklahoma numbers; (2) the RG representatives' visit to Oklahoma was an isolated incident of only a few hours; (3) there is no evidence that the sale of rigs to an Oklahoma company constituted a substantial portion of RG Petro's income; (4) the emails do not constitute solicitation of business in Oklahoma; and (5) the website is passive, providing only information.

### 6.  *Analysis*

#### a.  *Specific Jurisdiction*

For specific jurisdiction, Mr. Monge's injuries must arise out of or relate to activities that RG Petro purposefully directed at residents of the forum.  *See Intercon*, 205 F.3d at 1247.

Although Richard Energy, an Oklahoma company, purchased Rig 43, it was consigned to EWS, a Kansas company, and it was sent to Kansas, not Oklahoma.[8]  EWS, not RG Petro or Richard Energy, moved Rig 43 to Oklahoma.  Thus, the rig's "presence in the forum arose from the unilateral acts of someone other than" RG Petro, and

---

[8] Although the shipping mark included Richard Energy's Oklahoma address, the evidence is that the rig was shipped to Kansas.

generally "courts have been unwilling to allow states to assert personal jurisdiction" under such circumstances. *OMI*, 149 F.3d at 1092. "[S]pecific jurisdiction must be based on actions by the defendant and not on events that are the result of unilateral actions taken by someone else." *Bell Helicopter*, 385 F.3d at 1296.

In *Bell Helicopter*, the Tenth Circuit denied personal jurisdiction over defendant Copter Lease, a New Mexico corporation, which leased a helicopter to HeliQwest, a Washington state corporation. *Id.* at 1294-95. HeliQwest received the helicopter in Canada and moved it to its facility in Utah, where it was completely destroyed in a crash during a logging operation. 385 F.3d at 1295. Eagle Copters, HeliQwest Aviation, HeliQwest, and Copter Lease brought suit against Bell Helicopter, the manufacturer of the helicopter, in Canada. Bell Helicopter then filed a complaint in the United States District Court for the District of Utah against the plaintiffs in the Canadian action, seeking a declaratory judgment about the applicability of a federal statute to the accident.

In *Bell Helicopter*, we held that there was no personal jurisdiction in Utah over Copter Lease because HeliQwest, not Copter Lease, brought the helicopter to Utah. Also, Copter Lease had no offices, employees, or operations in Utah. Even though Copter Lease knew about HeliQwest's Utah facility and that HeliQwest might take the helicopter there, we said, citing *World-Wide Volkswagen*, that "mere foreseeability that a customer will unilaterally move a chattel into a given state does not create jurisdiction over the vendor [i.e., Copter Lease] of the chattel." *Id.* at 1297. We held that "[t]his mere possibility, even if true, does not suggest that Copter Lease purposefully availed

itself of the protections of Utah laws." *Id.* Like Copter Lease, RG Petro did not move

the chattel (Rig 43) into Oklahoma. Unlike Copter Lease, the record does not indicate

that RG Petro knew that EWS had operations in Oklahoma and could foresee the "mere

possibility" that EWS would "unilaterally move" Rig 43 from Kansas to Oklahoma. The

case for jurisdiction over RG Petro is therefore even weaker than it was for Copter Lease.

   The email contacts are tangential, at best, to Mr. Monge's injuries. Most were

responses to inquiries that Richard Energy made to RG Petro, and it is therefore

questionable whether they represent activity "purposefully directed" at an Oklahoma

resident. *See OMI*, 149 F.3d at 1091 (a court may assert specific jurisdiction if the

defendant purposefully directed activities at residents of the forum). More importantly,

the emails have little, if anything, to do with Rig 43. *See id.* (litigation must result from

injuries arising out of or related to activities directed at forum residents). The contract for

that rig had already been completed and was in the process of fulfillment regardless of

the emails. *See Kuenzle*, 102 F.3d at 456-57 (arising out of requirement is not satisfied if

the same injury would have occurred regardless of forum contact).

   Any contractual basis for jurisdiction in Oklahoma is similarly tangential to the

tort jurisdiction at issue here. Although RG Petro entered into a contract with an

Oklahoma corporation, "[a]n individual's contract with an out-of-state party cannot,

standing alone, establish sufficient minimum contacts with the forum state." *TH

Agriculture & Nutrition*, 488 F.3d at 1287. Rather, to establish sufficient minimum

contacts, a contract must "create continuing relationships and obligations with citizens"

-36-

of the forum.  *Id.* at 1287-88 (quotations omitted).  A court must look to "prior

negotiations and contemplated future consequences" to determine whether "the contract

relied upon to establish minimum contacts [has] a 'substantial connection' with the forum

state."  *Id.* at 1288 (citation omitted) (quotations omitted).

 This case involves a contract between a Chinese company (RG Petro) and an

Oklahoma company (Richard Energy), whereby the Chinese company would build a rig

that the Oklahoma company would send to a Kansas company (EWS) in Kansas.  If this

were a contract dispute between RG Petro and Richard Energy, jurisdiction in Oklahoma

might be proper because the dispute would arise out of the contacts with a state resident.

But this case arises not from a contract dispute but from an accident on a rig that was

consigned to a Kansas company and sent to Kansas.

 The district court concluded that Mr. Monge did not demonstrate by a

preponderance of the evidence that RG Petro "purposefully directed [its] activities at

residents of the forum, and [that] the litigation results from alleged injuries that arise out

of or relate to those activities."  *Intercon*, 205 F.3d at 1247.  We agree.  Although

jurisdiction over RG Petro may have been proper in Kansas, we hold that Oklahoma

courts lacked specific jurisdiction.

 Finally, Mr. Monge cites *Asahi*, 480 U.S. at 107, perhaps suggesting a stream of

commerce argument that jurisdiction was proper because RG Petro could foresee that its

products would reach the Oklahoma market because it was selling its rigs to an

Oklahoma company.  *See World-Wide Volkswagen*, 444 U.S. at 297-98 (holding that a

"forum State does not exceed its powers under the Due Process Clause if it asserts

personal jurisdiction over a corporation that delivers its products into the stream of

commerce with the expectation that they will be purchased by consumers in the forum

State."). Between *World-Wide Volkswagen*, where the Supreme Court first mentioned

stream of commerce, and *Asahi*, where the Court next addressed it, courts reached two

different interpretations of the stream of commerce approach to purposeful availment.

*See Asahi*, 480 U.S. at 110-11; *see also J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct.

2780 (2011). Neither approach "bolster[s]" Mr. Monge's claim of specific jurisdiction.

*Goodyear Dunlop*, 131 S. Ct. at 2855.

As explained by the *Asahi* plurality, to find purposeful availment, the first

approach requires more than placing a product into the stream of commerce. *Asahi*, 480

U.S. at 112 (plurality opinion). The substantial connection between the defendant and the

forum "must come about by *an action of the defendant purposefully directed toward the*

*forum State*." *Id*. (emphasis in original); *see also J. McIntyre*, 131 S. Ct. at 2788-89.

Under the second approach, simply placing a product into the stream of commerce is

consistent with due process as long as the defendant "is aware that the final product is

being marketed in the forum State." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring); *see*

*also J. McIntyre*, 131 S. Ct. at 2788.

Mr. Monge has not demonstrated that the district court has specific jurisdiction

under either theory. He has not met the first interpretation's requirement that RG Petro

purposefully directed actions toward the forum. *Asahi*, 480 U.S. at 112. RG Petro

-38-

expected that the rig would go to EWS in Kansas. As in *World-Wide Volkswagen*, there

is no jurisdiction because the product entered the forum through EWS's unilateral act, not

through RG Petro's efforts to serve the market. 444 U.S. at 297. Moreover, as RG Petro

expected that Rig 43 would go to Kansas, Mr. Monge has not met the second

interpretation's requirement that the defendant be "aware that the final product is being

marketed in the forum." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring).

The stream of commerce theory does not support Mr. Monge's argument that the

district court has specific personal jurisdiction.

### b. *General Jurisdiction*

For the district court to exercise general personal jurisdiction, Mr. Monge was

required to demonstrate by a preponderance of the evidence that RG Petro had

"continuous and systematic general business contacts" with Oklahoma. *Benton*, 375 F.3d

at 1080 (quotations omitted).[9]

RG Petro does not have an Oklahoma place of business, *see Omeluk v. Langsten*

*Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995), or Oklahoma phone listings. Its

---

[9] In cases arising from Utah law, we have employed a 12-factor test in analyzing general jurisdiction. *See Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295-96 (10th Cir. 1999). In cases from other states, we have employed a four-factor test. *See Kuenzle*, 102 F.3d at 457; *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1533 (10th Cir. 1996) (citing 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1067, at 298 (2d ed. 1987) (collecting cases)). Because the record is so meager as to "continuous and systematic" contacts, we need not decide which test is appropriate here.

website does not provide contacts that approximate physical presence.  *See Shrader*, 633 F.3d at 1243.  Representatives from RG Petro visited Oklahoma only once for a few hours.  The record contains only a limited number of emails to an Oklahoma party and similarly reflects only a limited number of sales to a single Oklahoma resident.

The district court did not err in concluding that Mr. Monge has not demonstrated by a preponderance of the evidence that RG Petro had contacts with the forum "so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 131 S. Ct. at 2851.  General jurisdiction was properly denied.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's orders granting summary judgment, denying the motion to alter or amend, and dismissing RG Petro for lack of personal jurisdiction.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker<br>Clerk of Court | December 07, 2012 | Douglas E. Cressler<br>Chief Deputy Clerk |

Mr. Scott B. Hawkins
Mr. Bradley E. Norman
Norman & Edem, PLLC
127 N.W. 10th Street
Oklahoma City, OK 73103

Mr. John W. Norman
Norman, Edem, Meyer, Wallace, Norman, Cox & Moser
127 N.W. 10th Street
Oklahoma City, OK 73103-4927

Mr. Peter J. Ram
Beeler, Walsh & Walsh, PLLC
4508 North Classen Boulevard
Oklahoma City, OK 73118-0000

RE:  **12-6009, Monge v. RG Petro-Machinery, et al**
    District docket: 5:09-CV-01188-R

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 18 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

cc:     Daniel E. Bryan III
        Gary W. Davis Sr.
        Harvey D. Ellis Jr.
        Frank Jason Goodnight
        Adam Hall
        Brion Brady Hitt
        C. William Threlkeld
        Christopher Todd Ward

EAS/ad